

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00024-CR

———————————————

SKYLER CORY RUDD, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from County Criminal Court No. 2
Tarrant County, Texas
Trial Court No. 1504825

---

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

A jury convicted Appellant Skyler Cory Rudd of assault causing bodily injury of a family member, interference with an emergency request for assistance, and unlawful restraint. Tex. Penal Code Ann. §§ 20.02(a), 22.01(a)(1), 42.062. The State and Rudd agreed to a 365-day jail sentence, probated for twenty months, and the trial court sentenced him accordingly. In two points, Rudd complains of jury-charge error. Because the jury-charge error did not egregiously harm Rudd, we affirm the trial court's judgments.

## II. Standard of Review[1]

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In reviewing a jury charge, we first determine whether error occurred; if not, our analysis ends. *Id.*

Unpreserved charge error warrants reversal only when the error resulted in egregious harm. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see* Tex. Code Crim. Proc. Ann. art. 36.19. The appropriate inquiry for egregious harm is fact- and

---

[1]Rudd does not challenge the sufficiency of the evidence. We therefore omit an initial statement of facts.

case-specific. *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013); *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011).

In making an egregious harm determination, we must consider "the actual degree of harm . . . in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. *See generally Gelinas*, 398 S.W.3d at 708–10 (applying *Almanza*). Errors that result in egregious harm are those "that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor*, 332 S.W.3d at 490 (citing *Almanza*, 686 S.W.2d at 172). The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174.

### III.  Recklessness Absent from the Assault Count but Included in the Jury Charge

In his first point, Rudd contends that "the jury charge was fundamentally defective" and that he was egregiously harmed because the jury charge allowed the jury to convict him of reckless assault when reckless assault was not alleged in the information. The State agrees that the jury charge erroneously included recklessness as a culpable mental state for the count of assault despite its absence from the information but argues that the error did not egregiously harm Rudd. Section

3

22.01 of the Texas Penal Code provides that "[a] person commits an offense if the person . . . intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse." Tex. Penal Code Ann. § 22.01(a). Count One of the information alleged that Rudd "intentionally or knowingly caused bodily injury to" his then girlfriend "by grabbing her cell phone[,] . . . injuring her finger, or by grabbing and restraining her with his arms." Thus, the information omitted reckless assault. The application paragraph in the jury charge provided,

> Now, if you find from the evidence beyond a reasonable doubt that . . . Rudd, in the County of Tarrant and State of Texas, on or about the 1st day of July, 2017, did then and there intentionally, knowingly or *recklessly* cause bodily injury to [the complainant], a member of [his] household or with whom [he] had a dating relationship, by grabbing her cell phone out of her hand thereby injuring her finger, or by grabbing and restraining her with his arms, then you will find [him] guilty as charged in Count One of the information.
>
> Unless you do so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit [Rudd] of Count One and say by your verdict not guilty.

[Emphasis added.] Thus, the jury charge allowed the jury to convict Rudd of reckless assault.

## A. Jury-Charge Error

When the jury charge allows the jury to convict the defendant of an offense different from the offense alleged in the charging instrument only because it involves a lower culpable mental state than alleged in the indictment, and no lesser-included offense instruction was requested or given, the jury charge is erroneous. *Reed v. State*,

4

117 S.W.3d 260, 265 (Tex. Crim. App. 2003). Thus, the trial court erred by instructing the jury that it could convict Rudd of recklessly causing bodily injury to the complainant when the information alleged only that he intentionally or knowingly did so. *See id.*; *cf. Limon v. State*, No. 03-10-00666-CR, 2012 WL 5392160, at *2–3 (Tex. App.—Austin Nov. 2, 2012, no pet.) (mem. op., not designated for publication) (in misdemeanor case, holding trial court committed egregious harm by erroneously instructing the jury it could convict defendant of reckless conduct when statute required intentional or knowing conduct for a conviction).

## B. No Egregious Harm

Rudd did not object to the error, so the issue is whether the error caused egregious harm. *See Nava*, 415 S.W.3d at 298; *Almanza*, 686 S.W.2d at 171. Again, in determining egregious harm, we review the entire jury charge, the evidence and issues, counsel's arguments, and any other relevant portions of the record. *Almanza*, 686 S.W.2d at 171.

### 1. Voir Dire

In the State's voir dire, the prosecutor told the venire members:

So now we're going to talk about the very first charge, the very first count, and that's assault family violence. So I want to talk to you about what it is we have to prove, right? That's a good place to start.

We have to prove that on or about a specific day, that the defendant, we've got to prove a person, in Tarrant County, Texas, we have to prove it happened here, intentionally, knowingly, or *recklessly*, and we'll talk about that more in a second, caused bodily injury to a member of the defendant's family or household.

5

. . . .

So now I want to talk to you, I said that there are—we have to prove that the defendant acted intentionally, knowingly, or *recklessly*. And so intentionally and knowingly are very similar in the law. Intentionally means kind of what it sounds, when someone's conscious intent to do something, that means that they acted intentionally. It can be inferred from what they did. We don't have to hear that they said, I'm intentionally going to do this to you. Right? We can tell by what they did.

And also, it can be formed in an instant. Right? So everyone on a different kind of case—we're in misdemeanor court right now. But, you know, when it talks about a murder case, you know, that can be formed in an instant. Everybody wants to talk about was it premeditated or not. In that kind of trial we might have more discussion about why it can be formed in an instant. But I think that it can be somewhat self-explanatory.

And knowingly is when a person acts with knowledge that what happened could happen. Right? And I know I'm getting some looks from y'all, and I get it, because intentionally and knowingly, what's really the difference. And so I think the best way to describe it is an example.

[Emphasis added.] The prosecutor then continued to discuss and give examples of

the intentional and knowing mental states before explaining the reckless mental state:

And then there's *recklessly*. And this pretty much means exactly what you think it does. Let me go to you, Mr. B[.] Did you ever hear a kid, like, go out to the country and shoot cans off a fence?

PROSPECTIVE JUROR: Sure. Yes.

[PROSECUTOR]: So let's say you go do this and you're going to do this out by Possum Kingdom Lake. Let's say in this scenario you've got some property out there. And you've got a fence keeping all the people from the lake, you know, from coming up and into your yard. Okay?

So you have this great fence and it's perfect for setting things on, right? Let's say on the Fourth of July you're like, you know, I haven't

6

been shooting in a while.  So you line some cans up.  But there's like wake boards and all kinds of people out on the lake.  Do you think that would be a very good idea?

PROSPECTIVE JUROR:  No.

[PROSECUTOR]:  Why?

PROSPECTIVE JUROR:  Never shoot when you don't know what's behind you, to be honest.

[PROSECUTOR]:  I mean, one could shoot them, right?  That would be a pretty *reckless* act, okay?

PROSPECTIVE JUROR:  Yes.

[PROSECUTOR]:  Right?

PROSPECTIVE JUROR:  Sure.

[PROSECUTOR]:  But even if there's no ill intent whatsoever, I mean, it would be pretty *reckless* to be shooting at cans on a fence when there's a bunch of people around.

PROSPECTIVE JUROR:  Yes.

[PROSECUTOR]:  So not a whole lot of explanation needed on this one.

[Emphasis added.]  Thus, our review of the record indicates that the prosecutor spent about as much time discussing recklessness as he spent discussing the intentional and knowing mental states.  Importantly, the prosecutor indicated in voir dire that the jury could convict Rudd of reckless assault.  We therefore conclude that the voir dire weighs in favor of harm.  *See Rodriguez v. State*, No. 14-05-00750-CR, 2006 WL 2971252, at *4 (Tex. App.—Houston [14th Dist.] Oct. 19, 2006, pet. ref'd) (mem. op., not designated for publication) ("In analyzing jury-charge error . . . , we

7

review the entire trial record, from voir dire through closing arguments at the punishment stage, to determine whether the appellant suffered 'egregious harm' from the deficient jury charge.").

## 2. The Entire Jury Charge

In the abstract portion of the charge, the trial court defined *intentionally*, *knowingly*, and *recklessly*. *Recklessly* was defined as follows:

> A person acts *recklessly*, or is *reckless*, with respect to *circumstances surrounding his conduct* when he is aware of but consciously disregards a substantial or unjustifiable risk that the circumstances exist. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the defendant's standpoint.

[Emphasis added.] Because assault causing bodily injury is a result-of-conduct offense, *Price v. State*, 457 S.W.3d 437, 442–43 (Tex. Crim. App. 2015) (holding that family-violence assault is a result-of-conduct offense); *Garfias v. State*, 424 S.W.3d 54, 60 (Tex. Crim. App. 2014) ("[A]n assaultive offense causing bodily injury is a result-oriented offense."), a circumstances-surrounding-the-conduct definition of *recklessly* like that given in this case would have been error even if reckless assault had been alleged in the complaint, *see Price*, 457 S.W.3d at 441. *Knowingly* was defined as follows:

> A person acts *knowingly*, or with knowledge, with respect to *the nature of his conduct* or to *circumstances surrounding his conduct* when he is aware of *the nature of his conduct or that the circumstances exist*. A person acts *knowingly*, or with knowledge, with respect to a *result of his conduct* when he is aware that his conduct is reasonably certain to *cause the result*.

[Emphasis added.] Again, because assault causing bodily injury is a result-of-conduct

8

offense, only the last definition of *knowingly* listed, the result-of-conduct definition, should have been included in the charge for this offense. *See id.* The correct definition of intentionally was given: "A person acts *intentionally*, or with intent, with respect to a *result of his conduct* when it is his conscious objective or desire to *cause the result*." [Emphasis added.] *See* Tex. Penal Code Ann. § 6.03(a).

The abstract charge instructed that a person commits assault if the person intentionally, knowingly, or recklessly causes bodily injury to another, including his spouse. While it is a true statement, the trial court erred by including reckless assault in the abstract paragraph for this offense because it was not alleged in the information. *See Reed*, 117 S.W.3d at 265.

Thus, the entire charge on the assault offense allowed the jury to convict Rudd of reckless assault despite the information's alleging only intentional and knowing assault. The charge as a whole therefore reduced the State's burden of proof for the assault count, and nothing in the charge diluted the error's effects. This factor weighs in favor of egregious harm. *See Limon*, 2012 WL 5392160, at *3. *But cf. Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999) (holding error in the abstract paragraph is not egregious when the application paragraph is correct); *Hughes v. State*, 897 S.W.2d 285, 296 (Tex. Crim. App. 1994) (holding court "may consider the degree, if any, to which the culpable mental states were limited by the application portions of the jury charge") (citation and internal quotation marks omitted).

9

### 3. The State of the Evidence

The information alleged that "on or about the lst day of July 2017," Rudd "intentionally or knowingly cause[d] bodily injury to [the complainant], a member of [his] family or household or with whom [he] had a dating relationship, by grabbing her cell phone out of her hand thereby injuring her finger, or by grabbing and restraining her with his arms." The defensive theory was that the complainant was lying about Rudd's various acts of misconduct in this case to win a custody battle over their child.

The complainant testified that

- She and Rudd began a romantic relationship in 2013.

- The first time Rudd assaulted her was in September 2015, when she was nine months pregnant with their son.

- On that occasion Rudd grabbed her right arm, refused to let go, and tried to force her to sit on the couch.

- She threatened to call the police, and then Rudd threatened to break her phone.

- She did not call the police but let Rudd talk, and he let go of her and left after he talked.

- She filed a police report.

- She and Rudd reconciled after he was awarded joint custody of their son and after he scared her by threatening to "make [her] life a living hell and a nightmare" otherwise.

- Rudd regularly spoke to her that way.

- On November 5, 2016, after she did not promptly answer Rudd's texts, he called her and "said that he was going to go shoot up the block and kill [their son, her, and himself] if [she] didn't do what he said to do," scaring her.

10

- Rudd threatened to kill their son, her, and himself several times, scaring her.

- The complainant believed Rudd's threats.

- On July 1, 2017, Rudd and the complainant were still "[p]retty much" in a relationship.

- Rudd became upset because the complainant's male cousin was meeting with the complainant at her home to talk, and Rudd was not invited.

- The complainant then told Rudd he could come to her home too, but he did not arrive until several hours after her cousin had left.

- Rudd was angry and wanted to look at her text messages since her cousin had left, "line by line he said."

- She initially refused but then went to the living room to get her phone; their son was also in the living room.

- She went back to the bedroom, where Rudd was.

- She held the phone in her left hand and refused again to give it to him.

- Rudd said, "[W]ell if you don't give me the phone, I'm going to take it by force."

- He "tried to grab" the phone from her left hand.

- "The case came open and . . . cut [her] finger."

- Rudd squeezed, grabbed, and "twisted [her] left index finger trying to get" the phone from her, leaving marks and swelling.

- Rudd "had [her] in a restraint trying to get [the] phone."

- Her right wrist and hand were bruised and marked from her attempts to get away.

- She escaped Rudd's restraint and went to the kitchen.

- He "grabbed [her] from behind" "as hard as he could," hurting her sternum, impeding her breathing, causing her pain, and leaving a bruise on her right shoulder and a red mark on her sternum.

11

- She told him he was hurting her and begged him to let her go.

- On July 2, Rudd came back to her apartment and "bandaged up [her] left index finger," which "was messed up."

- On July 3, the complainant saw a doctor, who documented her bruises.

- On July 5, the complainant reported Rudd's conduct to the police.

Officer Keith Chavis of the Benbrook Police Department testified that on July 5, he spoke to the complainant at her residence. He saw some bruising on her right thumb and a cut on her left index finger. He testified that the injuries he saw matched the injuries the complainant reported to him. He further testified that the injuries looked worse when he saw the complainant than the photographs portrayed.[2] He also testified that he noted on the family violence packet diagram that the complainant's right shoulder and right upper chest were injured and that her oral report to him and her written statement were consistent.

The detective in charge of the investigation arrested Rudd. Rudd's handwritten, sworn statement to the police provides, "I am not sure of any conflict resulting in harm or injury to [the complainant] or [her] phone. I did not steal her phone or make any hostile remark. I did not tell her she couldn't do anything or try to stop her from leaving." The detective testified that "given the situation, you would be sure whether or not this event actually took place." The evidence detailed above

---

[2]The photographs of the complainant's injuries admitted at trial were taken with a body camera.

sufficiently proves Rudd intentionally or knowingly caused bodily injury to the complainant.

### 4. The Arguments

The State did not emphasize the charged mental states or the assault in its initial closing argument, and the defense focused on the complainant's credibility and challenging the depth of the police investigation, not on the charged mental states, in its closing argument. In the State's final closing argument, the prosecutor spoke of the cycle of abuse; domestic violence; Rudd putting his "hands on" the complainant repeatedly; and the angry, threatening texts that Rudd sent on the day he committed the assault. The prosecutor summarized the evidence of Rudd's behavior after he arrived at the complainant's home:

> [H]e demanded to see the phone, and when she said, no, I'm calling the police, he grabbed it from her. He literally committed two crimes in that one act. He kept her from calling 911 and he mangled her fingers so bad she dealt with the pain for days afterward. You heard about how that finger had to be bandaged up.
>
> . . . .
>
> Because that's exactly what these victims of domestic violence do. They do whatever they can just to make the situation go away. He mangled her finger, he grabbed her from behind, and he assaulted her on her arm and on her chest as he grabbed her.

### 5. Analysis

Rudd contends that the complainant's testimony that her cell phone case separated from her phone when Rudd grabbed her, cutting and twisting her finger,

and the prosecutor's closing argument that Rudd assaulted the complainant by taking her phone describe actions that are closer to reckless than intentional or knowing. The State responds that after Rudd told the complainant he would take her phone by force, he intentionally or knowingly injured her by twisting her finger to grab her phone, and he also intentionally or knowingly injured her by restraining her with his arms hard enough to hurt her sternum, impair her breathing, and bruise her wrists. The State points out that when the jury charge contains alternative theories of culpability, we measure the harm, at least in part, against the likelihood that the jury's verdict was based upon an alternative theory not affected by the error. *Atkinson v. State*, 923 S.W.2d 21, 27 (Tex. Crim. App. 1996), *overruled on other grounds by Motilla v. State*, 78 S.W.3d 352, 356–57 (Tex. Crim. App. 2002). No harm is shown where: (1) the evidence clearly supports the defendant's guilt under alternate theories unaffected by the erroneous portion of the charge; (2) the State relies most heavily on the alternate theories; and (3) it is very likely that the jury's verdict was based on an alternate theory. *Rivera v. State*, 12 S.W.3d 572, 577 (Tex. App.—San Antonio 2000, no pet.).

Here, the complainant suffered a cut when her phone case separated from her phone as Rudd was assaulting her. At most, Rudd recklessly caused that cut. But Rudd intentionally and knowingly caused the complainant's remaining injuries—her twisted left index finger, her bruised right hand and wrist, her bruised right shoulder, and her sore sternum—by squeezing, grabbing, and twisting her left index finger; by

14

restraining her by her right hand and wrist, causing bruises; and by grabbing her from behind "as hard as he could," hurting and marking her sternum and bruising her right shoulder. Although the cut was discussed in testimony and the prosecutor mentioned the bandaging of the complainant's finger, the prosecutor emphasized the injuries Rudd intentionally or knowingly caused and did not rely exclusively on the cut finger to convict Rudd of the assault. Considering the entire record, we therefore hold the jury-charge errors complained of regarding the assault did not cause egregious harm. *See, e.g.*, *Sierra v. State*, No. 04-01-00455-CR, 2003 WL 21782285, at *2 (Tex. App.—San Antonio Aug. 1, 2003, no pet.) (mem. op., not designated for publication) (supplementing original opinion after the filing of defendant's petition for discretionary review and holding any error harmless because "the State's opening statement and closing argument reflect[ed] that the State relied heavily on the theory that Sierra committed aggravated assault by intentionally or knowingly causing bodily injury to Ramirez" and it was "likely the jury found Sierra guilty of aggravated assault because the evidence was compelling that he used a deadly weapon and intentionally or knowingly caused bodily injury to Ramirez"). This is not a case where the errors "affect[ed] the very basis of the case," "depriv[ed] the defendant of a valuable right," or "vitally affect[ed] a defensive theory." *Cosio v. State*, 353 S.W.3d 766, 777 (Tex.

Crim. App. 2011) (citation and internal quotation marks omitted). We overrule

Rudd's first point and that part of his second point pertaining to the assault offense.[3]

## IV. Mental States Not Tailored to Each Count

In his second point, Rudd contends that the jury charge was erroneous because

its definitions of mental states "were not tailored to each count according to [its]

respective conduct elements[,] nor did the charge otherwise indicate the proper

application of the mental state definitions to each count."

As the Texas Court of Criminal Appeals has explained,

> Section 6.03 of the Texas Penal Code sets out: four culpable mental states—intentionally, knowingly, recklessly, and criminally negligently; two possible conduct elements—nature of the conduct and result of the conduct; and the effect of the circumstances surrounding the conduct. In a jury charge, the language in regard to the culpable mental state must be tailored to the conduct elements of the offense. When "specific acts are criminalized because of their very nature, a culpable mental state must apply to committing the act itself." *McQueen v. State*, 781 S.W.2d 600, 603 (Tex. Crim. App. 1989). "On the other hand, unspecified conduct that is criminalized because of its result requires culpability as to that result." *Id.* A trial court errs when it fails to limit the language in regard to the applicable culpable mental states to the appropriate conduct element. *See Cook v. State*, 884 S.W.2d 485,

---

[3]Rudd indicates in a footnote that he urges his second point in the alternative for the assault offense. Because we have already held that the trial court's error of including *recklessly* in the charge on assault did not result in egregious harm, because we have already addressed the errors regarding the definition of *knowingly* in the charge in terms of the assault, and because *recklessly* does not appear in the application paragraphs for the remaining offenses, we confine our separate discussion of his second point to the offenses of unlawful restraint and interference with an emergency request for assistance and to the culpable mental states of *intentionally* and *knowingly*. *See* Tex. R. App. 47.1.

491 (Tex. Crim. App. 1994) ("Intentional murder . . . is a 'result of conduct' offense, therefore, the trial judge erred in not limiting the culpable mental states to the result of appellant's conduct.").

> We use the gravamen of the offense to decide which conduct elements should be included in the culpable mental-state language. The gravamen of the offense is: the "gist; essence; [or the] substance" of the offense (*Ballentine's Law Dictionary* 534 (3rd ed. 1969)); "[t]he substantial point or essence of a claim, grievance, or complaint" (*Black's Law Dictionary* 817 (9th ed. 2009)); "the part of an accusation that weighs most heavily against the accused; the substantial part of a charge or accusation." (*Webster's Encyclopedic Unabridged Dictionary of the English Language* 617 (1989)).

*Price*, 457 S.W.3d at 441. To determine the gravamen, we first look at the language of the statute. *Stevenson v. State*, 499 S.W.3d 842, 851 (Tex. Crim. App. 2016).

The jury charge here contained the following definitions of mental states:

> A person acts *intentionally*, or with intent, with respect to a r*esult of his conduct* when it is his conscious objective or desire to *cause the result*.

> A person acts *knowingly*, or with knowledge, with respect to *the nature of his conduct* or to *circumstances surrounding his conduct* when he is aware of *the nature of his conduct or that the circumstances exist*. A person acts *knowingly*, or with knowledge, with respect to a *result of his conduct* when he is aware that his conduct is reasonably certain to *cause the result*.

[Emphasis added.] Rudd specifically complains that *knowingly* was defined with respect to all three conduct elements.

## A. Interference with an Emergency Request for Assistance

### 1. Result-of-Conduct Definition of *Knowingly* Is Not Applicable

For the offense of interference with an emergency request for assistance, Rudd argues that the trial court erred by providing a definition of *knowingly* that included all

three conduct elements instead of limiting the definition to the nature of the conduct.

Section 42.062(a) of the Texas Penal Code provides that

> [a]n individual commits an offense if the individual knowingly prevents or interferes with another individual's ability to place an emergency call or to request assistance, including a request for assistance using an electronic communications device, in an emergency from a law enforcement agency, medical facility, or other agency or entity the primary purpose of which is to provide for the safety of individuals.

Tex. Penal Code Ann. § 42.062(a). The indictment tracked the statute. It is undisputed that the trial court erred by including the result-of-conduct definition of *knowingly* in the abstract portion of the jury charge as it pertains to this offense because the result or product caused by Rudd's conduct is not the statute's focus. *See Young v. State*, 341 S.W.3d 417, 423–24 (Tex. Crim. App. 2011) (discussing the three categories of offenses). The parties agree that this offense is a nature-of-conduct offense because the focus is on a defendant's specific actions, not results. *See id.* at 424. However, our sister court in Amarillo has held otherwise:

> The only culpable mental state for the offense of interference with an emergency request for assistance is "knowingly." Tex. Penal Code Ann. § 42.062(a) (providing that an individual commits the offense "if the individual *knowingly* prevents or interferes with another individual's ability to place an emergency call or to request assistance . . .") (emphasis added). Therefore, the offense of interference with emergency request for assistance is a "circumstances-of-conduct" offense because it is not the interference with just any call that is prohibited, it is the circumstance of the call being to an emergency assistance provider that makes the conduct fall within the purview of that statute.

18

*Alcoser v. State*, No. 07-18-00032-CR, 2019 WL 7044470, at *6 (Tex. App.—Amarillo Dec. 20, 2019, no pet. h.). Because we hold below that on this record, any harm is not egregious, *see Almanza*, 686 S.W.2d at 171, we need not decide whether this is a nature-of-conduct offense, a circumstances-of-conduct offense, or both. *See* Tex. R. App. P. 47.1.

### 2. No Egregious Harm

Rudd contends that the error egregiously harmed him because it allowed the jury to convict him under any of the three definitions of *knowingly*. The State argues that the strength of the evidence shows that Rudd did not suffer any harm. To reiterate, in assessing harm in this case, we examine "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. In addition to the definitions of *knowingly* discussed above, the jury charge provided the following abstract and application paragraphs for this offense:

> Our law provides that a person commits the offense of interfering with an emergency call if he *knowingly* prevents or interferes with another individual's ability to place an emergency telephone call; *knowingly* prevents or interferes with another individual's ability to request assistance in an emergency from a law enforcement agency, medical facility or other agency or entity the primary purpose of which is to provide for the safety of individuals.
>
> . . . .

19

Now, if you find from the evidence beyond a reasonable doubt that . . . Rudd, in the County of Tarrant and State of Texas, on or about the 1st day of July, 2017, did *knowingly* prevent or interfere with the ability of [the complainant] to place an emergency call or to request assistance, including a request for assistance using an electronic communication device, in an emergency from a law enforcement agency; or medical facility, or other agency or entity the primary purpose of which is to provide for the safety of individuals, by grabbing her cell [phone] from her hand, then you will find the Defendant guilty as charged in Count Two of the information.

Unless you do so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the Defendant of Count Two and say by your verdict not guilty.

[Emphasis added.] We note that the application paragraph tracked the indictment and the statute, and it did not apply the result-of-conduct definition of *knowingly*. *See Medina*, 7 S.W.3d at 640; *Morales v. State*, 853 S.W.2d 583, 585 (Tex. Crim. App. 1993); *Wright v. State*, No. 02-15-00399-CR, 2016 WL 6520189, at *4 (Tex. App.—Fort Worth Nov. 3, 2016, no pet.) (mem. op., not designated for publication) ("When the application paragraph of the charge correctly instructs the jury on the law applicable to the case, this mitigates against" finding egregious harm.).

If this is not a multiple-gravamen offense, the other *Almanza* factors confirm that Rudd suffered no egregious harm whether the nature-of-conduct or the circumstances-of-conduct definition of *knowingly* applies. *See Almanza*, 686 S.W.2d at 171. In voir dire, the prosecutor stated: "If you prevent or interfere with someone calling 911 or calling for emergency assistance in whatever way that that might be, that is a crime." She did not attribute a mental state to the offense. In the State's opening

20

statement, the prosecutor stated that the witnesses would tell the jury that Rudd prevented the complainant from calling 911; again, the mental state was not mentioned. In the State's initial closing argument, the prosecutor stated, "And in here you're going to see what interference of an emergency call is. And it says, essentially, prevent somebody from making an emergency call. She said at that moment I'm calling 911 and what does he do, takes it. That's your interference right there." In the State's final closing argument, the prosecutor said, "[Rudd] showed up at the house, demanded to see the phone, and when she said, no, I'm calling the police, he grabbed it from her. He literally committed two crimes in that one act. He kept her from calling 911 . . . ." Again, the prosecutor did not mention the mental state at all.

Most significantly, the evidence showed both that Rudd knew the complainant was trying to call 911 and that he knowingly stopped her; i.e., the evidence sufficiently supported the verdict under either the nature-of-conduct or the circumstances-of-conduct definition of *knowingly* given in the charge and did not improperly focus on Rudd's mental state regarding the results of his conduct. *See Atkinson*, 923 S.W.2d at 27; *Rivera*, 12 S.W.3d at 577. The complainant testified that Rudd wanted to examine her phone's text messages because he was upset that she had been alone with a male cousin. She further testified:

- Rudd said, "[W]ell if you don't give me the phone, I'm going to take it by force."

- The complainant told him she was "going to go ahead and call 911."

21

- He said, "No," and "tried to grab" the phone from her left hand.

- Rudd hurt her "left index finger trying to get" the phone from her.

- Rudd "had [her] in a restraint trying to get [her] phone" and eventually took the phone.

Based on our assessment of the entire record, any error in including an inappropriate definition of *knowingly* in the jury charge did not result in egregious harm. *See, e.g.*, *Lewis v. State*, No. 03-13-00275-CR, 2015 WL 1810389, at *6–7 (Tex. App.—Austin Apr. 16, 2015, pet. ref'd) (mem. op., not designated for publication) (holding no egregious harm because the application paragraph "properly applied the law to the factual context" despite the omission of the correct definition of *knowingly* from the abstract portion of the charge and the jury could have reasonably found the defendant guilty under the correctly tailored theory of intentional murder, given the evidence).

## B. Unlawful Restraint

### 1. Only the Result-of-Conduct Definition of *Knowingly* Applies

Section 20.02 of the Texas Penal Code provides that "[a] person commits an offense if he intentionally or knowingly restrains another person." Tex. Penal Code Ann. § 20.02(a). The indictment alleged that Rudd "intentionally or knowingly by force, intimidation, or deception restrain[ed the complainant] without her consent by restricting [her] movements . . . ." "The use of the prepositional word 'by' in either a statute or an indictment is a tip-off that . . . the phrase will be a description of how the

22

offense was committed. But that phrase is not the gravamen of the offense . . . ." *Price*, 457 S.W.3d at 443 (internal quotation marks omitted) (quoting *Jefferson v. State*, 189 S.W.3d 305, 315 (Tex. Crim. App. 2006) (Cochran, J., concurring)). As the parties agree, unlawful restraint is a result-of-conduct offense. *See* Michael B. Charlton, *Texas Practice: Texas Criminal Law* § 11.2 (2d ed.), Westlaw (database updated December 2019) (stating the "gravamen of [unlawful restraint] is restraint of the complainant without his or her consent"); *cf. Ashley v. State*, 527 S.W.2d 302, 306 (Tex. Crim. App. 1975) ("The salient fact in a case of false imprisonment is the fact of restraint.").

Rudd argues that "the trial court erred by failing to specify which definition of knowingly applied to the offense," allowing the jury to convict him "based on the application of the nature of conduct or circumstances definition of knowingly." It is undisputed that the trial court erred by including the nature-of-conduct and circumstances-of-conduct definitions of *knowingly* in the abstract portion of the charge for this result-of-conduct offense. The State argues, however, that the correct application charge and the overwhelming evidence of guilt negate any harm.

### 2. No Egregious Harm

To assess egregious harm related to this offense, we apply the same egregious-harm analysis employed for the other two offenses. *See Almanza*, 686 S.W.2d at 171. In addition to the definitions of *knowingly* and *intentionally* discussed above, the jury charge included the following abstract and application paragraphs for this offense:

23

> Our law provides that a person commits the offense of unlawful restraint if he *intentionally or knowingly* restrains another person.

> . . . .

> Now, if you find from the evidence beyond a reasonable doubt that . . . Rudd, in the County of Tarrant and State of Texas, on or about the 1st day of July, 2017, did *intentionally or knowingly* by force, intimidation, or deception restrain [the complainant] without her consent by restricting [her] movements . . . then you will find the Defendant guilty as charged in Count Three of the information.

> Unless you do so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the Defendant of Count Three and say by your verdict not guilty.

[Emphasis added.]  The application paragraph tracked the indictment and the statute and correctly applied the result-of-conduct definition of *knowingly*.  *See Medina*, 7 S.W.3d at 640; *Morales*, 853 S.W.2d at 585; *Wright*, 2016 WL 6520189, at *4.

In voir dire, the prosecutor stated that the unlawful-restraint count alleged that "on or about a certain date, the defendant, in Tarrant County, intentionally or knowingly restrained another person."  She used the term *knowingly* correctly, modifying the result *restrained.*  In the State's opening statement, the prosecutor stated that the witnesses would tell the jury that Rudd "unlawfully restrained [the complainant] in her own home"; the mental state was not mentioned.  In the State's initial closing argument, the prosecutor stated,

> And now that the assault is over, he's not done with her yet.  He's looking through her phone, still exerting his power and control over her.

> But now he has her restrained in the laundry room.  She's up against the wall, can't move.  He's exerting his power and control over her and won't even let her leave the laundry room.  She's in there for

24

about from 30 minutes to an hour. She told you that on the stand. And that's your unlawful restraint. He—it's simple. He didn't allow her to leave. And you can't unlawfully restrain somebody that way.

Again, the prosecutor did not mention the mental state at all.

Most significantly, the evidence showed that Rudd intentionally restrained the complainant; i.e., the evidence sufficiently supported the verdict under an alternative theory untouched by any error. *See Lewis*, 2015 WL 1810389, at *6–7; *see also Atkinson*, 923 S.W.2d at 27; *Rivera*, 12 S.W.3d at 577. The complainant testified:

- She finally freed herself after the assault and went through the bedroom and bathroom into the laundry room;

- Rudd followed her and blocked the laundry room's doorway.

- She twice tried to get out by going through his legs; he pushed her back both times.

- She begged him to release her, but he refused to do so until they went "over the[] text messages."

- For thirty minutes to an hour, he sat on a laundry basket of clothes reviewing her text messages and asking her whether she was cheating on him while she lay a foot away from him, "smashed up against the washer . . . in a curled-up position."

- He released her from the laundry room after he finished reviewing her text messages.

Based on our assessment of the entire record, any error in including the nature-of-conduct and circumstances-of-conduct definitions of *knowingly* in the abstract portion of the jury charge did not result in egregious harm regarding this offense. *See Atkinson*, 923 S.W.2d at 27; *see, e.g., Lewis*, 2015 WL 1810389, at *6–7; *Alexander v. State*, No. 05-99-01781-CR, 2000 WL 1683048, at *6–7 (Tex. App.—Dallas Nov. 10,

25

2000, pet. dism'd, untimely filed) (holding even if including *knowingly* in the capital murder charge was error, any harm was not egregious when the State's evidence and argument focused on intentional murder). We overrule the remainder of Rudd's second point.

## V. Conclusion

Having overruled Rudd's two points, we affirm the trial court's judgments.

/s/ Dabney Bassel
Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: February 27, 2020